THE PEOPLE OF THE STATE OF NEW YORK ex rel. THAT PORTION OF THE CAYUGA NATION OF INDIANS' RESIDING IN CANADA v. THE BOARD OF COMMISSIONERS OF THE LAND OFFICE OF THE STATE OF NEW YORK, RESPONDENTS.

*Treaties between the State and Indian tribes — right of a portion of the tribe to enforce payment of their part of an annuity — their claim must be heard and determined by the board of land commissioners — 1841, chap. 234, sec. 4.*

Upon the application of the relators, who claimed to be that portion of the Cayuga nation of Indians residing in Canada, a writ of *certiorari* was issued requiring the board of commissioners of the land office to return all petitions, papers and documents pertaining to an application made by the said relators to the said board to receive their share of an annuity which the State of New York had by treaties agreed and promised to pay forever, which application had been rejected by the said board.

*Held*, that section 4 of chapter 234 of 1841 imposed upon the board the duty of hearing and determining the application made by the relators.

That the fact that since the war of 1812 no portion of the annuity had been paid to the Canadian branch of the nation, on the ground that they had taken part in that war against the United States, did not authorize the rejection of their claim, if it were otherwise well founded, as it did not appear that the debt.

due to them had been confiscated either by the State or the United States government.

That the right of the relators to recover a portion of the annuity under the original treaty made with the whole nation could not be affected by the provisions of treaties subsequently made by the State with portions of the nation, to which the relators were not parties.

CERTIORARI issued to review the decision of the board of commissioners of the land office rejecting an application made by the relators. The writ required the board of commissioners of the land office to return all petitions, papers and documents pertaining to an application made by the relators to the said board to receive their share of an annuity which the State of New York had by treaties agreed and promised to pay forever, which application had been rejected by the said board.

The relators, claiming to be that portion of the Cayuga nation of Indians residing in the province of Ontario, Canada, presented their petition to the board of commissioners of the land office to be paid their portion of certain annuities which the State had agreed to pay that nation. The petition was dismissed upon the following opinion of the attorney general:

"STATE OF NEW YORK:

OFFICE OF THE ATTORNEY GENERAL,  }
ALBANY, *April* 30, 1884. }

*To the Honorable the Commissioners of the Land Office:*

SIRS.— In the matter of the petition and memorial of "that portion of the Cayuga nation of Indians residing in Canada," referred to me for my opinion, I have the honor to report as follows.

1. That by virtue of former treaties made at Fort Stanwix and Cayuga Ferry, in the years 1790 and 1795, respectively, the people of the State of New York, in consideration of the cession of large tracts of lands by the Cayuga nation of Indians, engaged to pay to the said Cayuga nation the sum of $2,300 annually.

2. That this annuity has ever since been, and is now, regularly paid by the State.

3. That at the time of the making of the said treaties part of said nation resided in Canada, and came by request of the State to

590     PEOPLE ex rel. CAYUGA INDIANS v. COM'RS.

THIRD DEPARTMENT, JANUARY TERM, 1885.

the councils held at the above-mentioned places to take part in the treaties.

4. That a branch of the nation resided in the western part of this State, and yet another branch at or near Sandusky, Ohio.

5. That that branch residing at Sandusky, Ohio, in or about the year 1831, moved west of the Mississippi, and have since nearly all died.

6. That at the time of the making of the treaties above-mentioned, the head chief of the Cayuga nation of Indians was " O-ja-geht-ti," or Fish Carrier.

7. That said chief, " O-ja-geht-ti," had [the keeping of the treaty.

8. That said treaty is now in the care and possession of a chief, " O-ja-geht-ti," who claims to be a lineal descendant of the " O-ja-geht-ti " to whom was intrusted the treaty, and to be the present head chief of the Cayuga nation of Indians. He resides with the branch of the nation in Canada, and is one of the petitioners.

9. That this annuity of $2,300 was apportioned among these different branches of the nation until and including the year 1809, that branch of the nation residing in Canada receiving their proportionate share thereof.

10. That at the time of the war of 1812 and 1814 the Canadian branch of the nation, being subjects of the British crown, took part in the war against the United States.

11. That since, on account of their participation in the war of 1812 and 1814, as subjects of the British crown, no portion of the annuity has been paid them, but the whole sum has been distributed among the branches of the nation within the United States.

12. That in April, 1882, these same petitioners, by their attorney, Hon. James C. Strong, petitioned to the then commissioners of the land office, your predecessors, claiming their proportionate share of all annuities that had been paid the Cayuga nation of Indians in the United States since said stoppage of payment to the branch of said nation residing in Canada in 1812, or thereabouts, and asking also that they receive their proportionate share of all future payments; which petition was referred to the Hon. Leslie W. Russell, then attorney general, who made a report to this board under date of September 22, 1882.

13. That, acting upon that report, the said commissioners of the

land office concluded that it was a matter that should come before the legislature of the State instead of their board, and denied the petition.

14. That since that date the petitioners, through their said attorney, filed with the board of claims a claim for that part of the annuities paid the Cayuga nation of Indians since 1812, or thereabouts, which, in his view of the case, should have been paid to that branch residing in Canada, and presented to your honorable board the present petition and memorial in reference to *future* payments of the annuity.

15. That the board of claims have decided that they have no jurisdiction in the matter of the claim filed before them, and have ordered it dismissed.

16. That this whole matter has, at various times, been the subject of legislative discussion and action.

17. That in 1849, upon a memorial of the chiefs and warriors of the Cayuga Indians residing in Canada, presented to the legislature, asking practically the same relief now demanded by the petitioners, as to future payments of the annuity, the matter was referred to the then board of land commissioners.

18. That said board on the sixteenth of March of that year made an elaborate report to the legislature, in which the various treaties between the State and the said Cayuga nation of Indians were considered; the reasons for paying the whole annuity to the branches of the nation residing in the United States discussed, and the conclusion reached that such petitioners were entitled to the relief prayed for.

19. That said report, upon its receipt by the legislature, was referred to its committee on Indian affairs, but that no further action seems to have been taken thereon.

20. To the report of the commissioners of the land office referred to, found in volume three of assembly documents of 1849, No. 165, to the assembly journal of that year, to the several treaties between the State and the Cayuga nation of Indians entered into since 1812, to the report of Hon. Leslie W. Russell, referred to above, and to numerous other State papers and references upon the same general subject which are scattered through the legislative records, your attention is respectfully directed.

21. That the board of land commissioners undoubtedly have

jurisdiction of this matter, by virtue of the provisions of chapter 234 of the Laws of 1841.

22. That the granting of the petition, however, involves questions of State policy which have been the subject of legislative consideration from time to time for many years.

23. That as a usage has prevailed so long opposed to the granting of the relief prayed for, and the legislature failed to adopt the recommendations in the formal report of your predecessors, mentioned above, it seems to me that your honorable board should now hesitate to exercise the authority thus delegate l.

24. That the State by later treaties, formally entered into, has contracted to pay the entire annuity to the branches of the nation residing within the United States.

25. That in the event of the present recipients of the annuity refusing their consent to its reapportionment, and the payment of a large portion of the sum which they have been so long in the habit of receiving to their Canadian brethren, either said later treaties and contracts must be repudiated, or an additional annual appropriation made to satisfy the claims of these petitioners.

26. That in my opinion these are questions which your honorable board should not attempt to decide, but which should be relegated to the legislature, the body which alone can, by necessary appropriation, effectuate any relief in the event that the claim of petitioners should be adjudged a just one.

27. That it hardly seems proper to subject the present recipients of the annuity, as well as the petitioners, to the expense of attending before this board in support of their respective rights, when the legislature might, in the end, fail to carry out, by necessary legislation, the recommendations of this board, as they did those of your predecessors in 1849.

28. I am therefore of the opinion that this is a matter that would more properly go before the legislature, the only body that has power to supplement its conclusions by proper legislation, and that your honorable board, for the reasons given above, should decline to entertain the petition.

Yours, very respectfully,

D. O'BRIEN,
*Attorney General.*"

*James C. Strong,* for the relators.

*D. O'Brien,* attorney general, for the respondents.

LEARNED, P. J.:

This is a hearing upon a return to a writ of *certiorari* by which the relators seek to review the action of the respondents in denying the relief asked in a petition presented to them by the relators. The first point made by the respondents is that the relators have no standing in court, inasmuch as they do not come either as individuals or in any corporate capacity. The reply of the relators to this is a reference to chapter 234, Laws of 1841. The fourth section of that act imposes on the respondents the duty " to hear and determine all questions which may arise in relation to moneys under the control of this State belonging to any Indian tribe or nation, or individual Indian or his descendants, or any *part or portion of them,* and all questions which may arise between the various *parties of such tribe or nation* in relation to any of their lands in this State, or the avails thereof." Section 5 gives power to the respondents to make arrangements with any tribe or nation of Indians, or with any part or portion of them, or with any individual Indian or Indians, who have any claim upon moneys belonging to them under the control of the State.

Here we have power given to determine questions and make arrangements with a tribe or nation, with individual Indians, and with a part or portion, or parties of a tribe or nation. This evidently contemplated the fact that there was, or the possibility that there might be, portions, or parts or parties of a tribe or nation, with whom arrangements should be made and questions determined, not quite as individuals but as bodies possessing some organization and capable of acting. It appears further, as a matter of fact, that there are distinct portions or parts of this tribe of Indians: one residing in Canada, one residing in New York, and one, quite small, west of the Mississippi, and that the respondents have from time to time made arrangements in regard to the money in question with some of these parts or portions of the nation. Thus a construction has been given to the act; a construction which seems reasonable and necessary when we consider the fact of this separation of the

594  PEOPLE ex rel. CAYUGA INDIANS *v.* COM'RS.

Third Department, January Term, 1885.

tribe into these parts or portions. It could hardly have been intended that the arrangements mentioned in the act should be made with every individual Indian. But it must have been intended that these portions of the tribe might severally act in respect to these moneys as distinct bodies. It seems to us, therefore, that we ought not to dismiss this matter on the ground that the individual Indians are not petitioners. In fact the petitioners seem to claim that they really compose the nation, having among them the sachems and an hereditary head chief and three-fourths of the whole number of the tribe.

On the 25th of February, 1789, the State made a treaty with the Cayugas, by which that nation ceded most of its land, in consideration among other things of $500, to be paid annually to the Cayugas and *their posterity forever.* On the 27th of July, 1795, a grand council of the Cayugas was held at Cayuga Ferry, at which were gathered the chiefs and warriors, as well those residing in the State, as those residing in Canada; and a treaty was made with the State, by which the Cayugas sold all their land, except three small pieces, for $1,800 annually. And it was agreed that these two annuities, making $2,300 annually, should be paid at Canandaigua. It was agreed that the receipt for these annual payments should be indorsed on the counterpart or duplicate treaty in possession of the Cayugas. The head chief of the Cayugas is known as O-ja-geht-ti. And this duplicate treaty is now in the possession of the head chief in Canada, known by that name, who is the successor of the head chief living when the treaty was made. One of the excepted pieces of land was reserved to him, a piece one mile square at Cannogai.

In 1807 the Cayugas, for a consideration paid at the time, ceded all the reserved land except this piece of one mile square reserved to the head chief. In 1809 and 1810 a large number of the Cayugas, with their head chief and sachems, removed to Canada, making, with those already there, more than three-fourths of the whole, and they have remained there ever since. No part of the annuity has been paid to them since that time, because, being subjects of Great Britain, they took part in the war of 1812 against the United States. Some of the Cayugas who remained in the United States had removed to Sandusky, Ohio. Up to 1809 the annuity

PEOPLE ex rel. CAYUGA INDIANS v. COM'RS.     595

Third Department, January Term, 1885.

was apportioned among the three different branches; the Canada branch, the Sandusky branch, the New York branch, each receiving a portion.   In 1829 an arrangement was made with the Sandusky branch, by which their share of the annuity was to be sent to them. This portion of the nation was about to remove in 1831 beyond the Mississippi, and in that year another arrangement was made between them and the State, by which the State was to pay them $1,700, and those residing near Buffalo $600.   Several times since 1841 the board of commissioners of the land office have made apportionments of the annuity between the New York branch and the western branch, and the whole annuity has been distributed between these branches of the nation.

The petitioners now ask the board to hear them and to take evidence as to their right to a portion of the annuity, insisting that they number 850, while all who are in the United States are only 276; that among them is the head chief O-ja-geht-ti and the lawful chiefs or sachems, and that the head chief has the duplicate treaty in his lawful possession.

The board of commissioners admit by the opinion of the attorney general, which they adopted, that they undoubtedly have jurisdiction in the matter under the statute above cited.   But they insist that the granting the petition involves questions of State policy; that a report made by the board to the legislature in 1849, favorable to the claim of the Canada branch, was not acted upon by the legislature; that long usage is contrary to the petitioners' claim, and that the subsequent agreements to pay the whole annuity to other branches deprive the petitioners of their rights.   These are the grounds, which appear in the return, for denying the petitioners' claim.

Upon the argument of this *certiorari*, however, the respondents insist that the Indians cannot sue or be sued in our courts.   The statutory restrictions referred to by counsel seem to apply to Indians residing in this State and who are, therefore, under its protection. Nor can this restriction be intended to prevent the respondents from discharging the duty imposed on them by the statute above cited.   If that statute imposes a duty in respect to Indians, which the respondents refuse to discharge, there must be a remedy in the courts to compel the respondents to do this duty.

We may further remark that this proceeding is not open to the objection that the petitioners are suing the State upon treaty rights. The petitioners are only seeking to compel the tribunals, which the State has itself appointed, to do the duty which the State has imposed upon it. We see nothing in the statute already cited which forbids this court from exercising that control over the respondents in this matter, which it may lawfully exercise in other cases. There is nothing to indicate that the action of the respondents is beyond review by the proper authority; at least to the extent asked by the petitioners.

Again, it is said that, in making the treaty of 1795 and those which preceded, the Cayugas acted in a sovereign capacity, as a nation, and that the rights thereby acquired are to be enforced only as other treaties are enforced between sovereign States. Now, we ought not permit words such as "sovereign States," "treaties," and the like, to conceal the real facts. The Cayugas were an independent nation of Indians, possessing a large amount of land in this State. The State by its "treaty" with them bought all (that is, substantially all) this land. We know that this purchase practically deprived the nation of its home, and resulted in its separation into three parts, and the removal of these parts to different places. We know, also, that the nation did not own these lands in the manner in which this State (for instance) owns lands. The State owns lands in absolute proprietorship, as an individual does. An individual may not trespass on the land of the State. While, on the contrary, the lands of the Cayugas belonged to each member of the tribe, and each had the right of enjoyment and using the same. It is in recognition of this that the State has divided up and distributed the annuity among the branches, in some proportion to the numbers belonging to each branch.

This same idea is indicated by the fact that the annuity is payable to the Cayugas " and *their posterity* forever." Now, this word "posterity" would be applicable only if the payment were to be for the benefit of the individual members who should compose the nation. A nation is not said to have posterity. For the nation is perpetual, if it exists as a nation; and therefore when the word "posterity" was used it indicated that a time was anticipated when there would be no longer a nation as such, though there would still

PEOPLE ex rel. CAYUGA INDIANS v. COM'RS.    597

THIRD DEPARTMENT, JANUARY TERM, 1885.

remain the posterity of the individuals.   We can hardly think of any people as a nation who have not a part of the earth's surface belonging to them as such; and this is especially true of such a nation as the Cayugas were.

But this argument must take another form.   It may be said that, granting the right of these several branches to present their several claims, inasmuch as they cannot, or do not, any longer act as one nation, yet such claims should be presented to the legislature and not to the courts.   There might be much force in this if it was not that the legislature, by the statute already recited, had conferred power on these respondents to act in the matter and to adjust these claims.   Certainly the State may give power to the board of commissioners to hear the matter, even though otherwise it would be a matter only for the legislative power; and the respondents admit their power to be undoubted.   Now, in conferring this power on the respondents we must understand that the legislature intended to authorize them to do justice.   It was not intended to commit to them any questions of State policy.   Indeed it is difficult to see what questions of that nature arise.   The war of 1812 is long passed. To pay these petitioners (if they show themselves entitled) will not be to give aid and comfort to an enemy.   After a lapse of some seventy years it is not probable that there are many of these petitioners who fought against us.   Furthermore there is nothing to indicate that this debt was ever confiscated to the State, or to the United States, during that war, even if we admit that the war had the effect to suspend the payment.   It seems to us, therefore, that there is no question of State policy to prevent the respondents from acting.

But, again, it is insisted that these respondents have made subsequent treaties (so to call them), by which the State has agreed to pay this annuity to other branches of the nation than those in Canada.   In reply, we may say that these agreements cannot be properly treaties, since they appear to be made only with two branches of the nation, and those not the majority of the whole. Nor does it appear that these are permanent arrangements, since changes therein have been made.   Nothing is shown which indicates that there have been made any arrangements which cannot be changed.   The statute provides for the settlement of questions

between the various parties of the nation. Suppose, after such settlement, one of the parties should become extinct. Can there be no new adjustment? Furthermore, if these petitioners have a right to be heard, and they certainly come within the language of the statute, how can any arrangement with another part of the nation to which they are not a party, or when they have not been heard, deprive them of their rights? The statute evidently estab lished the respondents as a tribunal to hear and determine these conflicting rights of the several portions of the tribe. The respondents, without hearing these petitioners, allot to the other claimants the whole amount in dispute; call such allotment a treaty, and, as a treaty, allege that it is conclusive against the petitioners. That is not just. They were charged with the duty of hearing and determining the questions. They have not heard and determined the question on the claim of these petitioners. But, furthermore, if by the action of these respondents the State has become liable to pay to the portions in the United States, that may increase the liability of the State. It does not diminish the claim of these petitioners. They stand on the treaty granting this annuity. For that annuity their ancestors sold their land. The State has had the consideration, and must pay the purchase-money. And the State must pay to the lawful claimants; not arbitrarily to those whom they prefer. If the State establishes a tribunal to determine who are entitled, these petitioners must be heard and their rights legally passed upon.

Suppose the treaties of 1789 and 1795 had never been made, all of these, who are now the posterity of the Cayugas of the date of those treaties, would have had their rights in this great property. All of them would practically have been owners of it. They should all have the same rights now in the annuity, which was promised in payment for the land. It matters not where they live, whether under this government or under that of England, their rights are the same. Nor does it matter that they are broken up into portions and can no longer be called one nation, or that their several rights are thus in conflict. So far as is possible, the rights of all should be protected, so that, in the way best suited to their habits, every family or every individual should enjoy the benefit of the annuity.

We are of the opinion that the relief asked by the relators should be granted. The exact form can be determined on settling the order.

Present — LEARNED, P. J., LANDON and FISH, JJ.

Order granted as prayed for by the petitioners; form of order to be settled by LEARNED, P. J.